USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED:___5/27/2020___

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

Matthew Whittington,

                    Plaintiff,

          –v–

Commissioner Joseph Ponte, *et al*.,

                    Defendants.

16-cv-1152 (AJN)

OPINION & ORDER

ALISON J. NATHAN, District Judge:

       In this Section 1983 action, pro se Plaintiff Matthew Whittington alleges that Defendants violated his constitutional rights during his incarceration at Rikers Island. The Defendants include numerous corrections officers, supervisors, and the City of New York. Defendants have moved for summary judgment as to all claims. The Court concludes that Defendants are entitled to judgment as a matter of law because, on the undisputed facts, Plaintiff has not alleged or demonstrated Defendants' personal involvement, has failed to exhaust most of his claims, and has otherwise failed to state a claim. Defendants' motion is therefore GRANTED.

I.    **BACKGROUND**

      **A.  The City's Factual Recitation**

       Along with its motion for summary judgment, the City submitted a Rule 56.1 statement, laying out its version of the undisputed facts in this case. *See* Dkt. No. 161 (Def. 56.1). In accordance with this District's Local Rule 56.2, the City also provided Plaintiff a notice regarding opposing a motion for summary judgment. *See* Dkt. No. 159. This notice advised Plaintiff that his claims could be dismissed without trial if he failed to respond to the City's

motion "by filing sworn affidavits and/or other documents as required by Rule 56(c) of the

Federal Rules of Civil Procedure and Local Rule 56.1."  *Id.*  The notice also stated that "Rule 56

provides that you may NOT oppose the Defendants' motion simply by relying upon the

allegations in your second amended complaint.  Rather, you must submit evidence, such as

witness statements or documents, countering the facts asserted by the defendants and raising

specific facts that support your claim."  *Id.*  In response to the City's motion, Plaintiff submitted

a memorandum of law and attached various documents.  He did not submit any affidavits,

respond directly to the City's 56.1 statement, or provide his own 56.1 statement.  All of the

documents Plaintiff attached were already submitted by the City.  In other words, Plaintiff does

not put forward any evidence different than that submitted by his counterparty.

Where a pro se Plaintiff receives notice under Local Rule 56.2 but "fails to submit a

responsive statement or otherwise contravene Defendants' statements in [their] opposition . . .

the facts in Defendants' statement may be deemed admitted."  *Omor v. City of New York*, No.

13-cv-2439 (RA), 2015 WL 857587, at *2 (S.D.N.Y. Feb. 27, 2015); *Shands v. Lakeland Cent.

Sch. Dist.*, No. 15-cv-4260 (KMK), 2018 WL 3315738, at *1 (S.D.N.Y. July 5, 2018), *aff'd*, 771

F. App'x 121 (2d Cir. 2019).  Nonetheless, the Court must also afford "special solicitude" to pro

se litigants.  *Jackson v. Fed. Exp.,* 766 F.3d 189, 195 (2d Cir. 2014).  The Court will thus

liberally construe Whittington's submissions to raise any disputes or discrepancies they suggest.

*See, e.g.*, *Cherry v. Byram Hills Cent. Sch. Dist.*, No. 11-cv-3872, 2013 WL 2922483, at *1

(S.D.N.Y. June 14, 2013) ("[W]here a pro se plaintiff fails to submit a proper . . . Rule 56.1

statement in opposition to a summary judgment motion, the Court retains some discretion to

consider the substance of the plaintiff's arguments, where actually supported by evidentiary

submissions." (italics and internal quotation marks omitted)).  The Court thus draws the

following facts from Defendants' Rule 56.1 Statement, but liberally construes Plaintiff's submissions to raise any disputes or discrepancies they suggest with respect to Defendants' portrayal of the facts.

### B.  Whittington is Arrested and Pleads Guilty to State Charges

On August 21, 2013, Plaintiff was arrested and charged with assault in the second degree, obstructing governmental administration, disorderly conduct, and harassment, in violation of New York Penal Law Sections 120.05(3), 195.05, 240.20(1), and 240.26(1).  Def. 56.1 ¶ 1.  He was then remanded into the custody of the New York City Department of Correction and was placed at Riker's Island.  *Id.*  Plaintiff eventually pleaded guilty to these charges and was sentenced to one-year imprisonment.  *Id.* ¶ 2.

On April 8, 2014, Plaintiff was arrested for arson in the second, third, and fourth degrees, reckless endangerment, and criminal mischief, in violation of New York Penal Law Sections 150.15, 120.20, and 145.00.  In June 2016, Plaintiff again pleaded guilty, and was sentenced to about four to seven years' imprisonment.  *Id.* ¶ 3.

### C.  The Underlying Incidents

This case stems from numerous incidents between Whittington and state employees.  The Court reviews these incidents in turn.  On October 31, 2014, physicians on Riker's Island saw Whittington.  *Id.* ¶¶ 7, 8.  He informed doctors that he was in a car crash the day before, and complained of a headache and jaw pain.  *Id.* ¶ 9.  But Whittington refused medical treatment and did not attend a follow-up appointment.  *Id.* ¶¶ 10, 11.  About one week later, he returned to the medical center, complaining of injuries unrelated to his prior report.  *Id.* ¶ 12.  He was seen at the medical center several times in the following days.  *Id.* ¶¶ 12–14.

On November 11, 2014, a corrections officer (who is not a party to this litigation) searched Whittington's cell and recovered "a broken handcuff key" and a "plastic bag containing

what appeared to be a green leafy substance," which "tested positive for marijuana."  *Id.* ¶¶ 17–19.  Whittington was thus "identified for Centrally Monitored Case Status" and received notice of this designation.  *Id.* ¶¶ 22–24.  He was also given an infraction, but no penalty was imposed. *Id.* ¶ 21.

On November 16, 2014, multiple officers were transporting Whittington to his cell.  *Id.* ¶¶ 25–26.  As the cell door closed, Plaintiff "charged at the officers and attempted to exit the cell."  *Id.* ¶ 29.  "The members of the probe team issued direct orders to plaintiff to stop resisting, then entered the cell and used upper body control techniques to attempt to gain plaintiff's compliance.  Once they gained plaintiff's compliance and applied mechanical restraints, and plaintiff was placed on a gurney and escorted to the urgicare center."  *Id.*  Plaintiff received medical care on Riker's Island over the course of three days.  *Id.* ¶ 31.  He was also treated at Bellevue Hospital, "where his chief complaint included that he had swallowed a sharp object and needs medical and psychiatric clearance."  *Id.* ¶ 32.  However, "physicians determined that the razor blade was 'clearly external.'  In fact, plaintiff had taped the razor blade to the outside of his body, and he would not allow for further inspection of the item that contained the razor blade." *Id.* ¶ 33.  The City conducted an internal investigation, finding that the use of force was appropriate.  *Id.* ¶¶ 34–36.  Whittington received an infraction, but no penalty was ultimately imposed.  *Id.* ¶¶ 37–41.

On January 16, 2015, various officials conducted a personal search of Whittington.  But Whittington refused to comply with search procedures and "instead took the jewelry that was around his neck (a chain) and put it into his mouth."  *Id.* ¶ 44.  "When [a non-party corrections officer] attempted to pick up the belt, plaintiff attempted to strike the officer."  *Id.* ¶ 45.  And as "the officers attempted to gain plaintiff's compliance, Captain Collazzo utilized a one (1) second

burst of chemical agent." *Id.* ¶ 46.  Because the chemical agent "did not have the desired effect because plaintiff continued to struggle with officers," Captain Collazzo used another "one (1) second burst of chemical agent." *Id.* ¶ 47.  Whittington "continued to physically resist before he was ultimately restrained." *Id.*  Whittington was then treated and examined by a medical officer. *Id.* ¶ 50.  The City conducted a use-of-force investigation and found no error. *Id.* ¶¶ 51–52. Whittington was served with numerous infractions, "cleared for lock-down in the Restricted Housing Unit," and "placed on Enhanced Restraint Status." *Id.* ¶¶ 53–57.  He then attended a disciplinary hearing, was found guilty of numerous charges, and was "sentenced to ninety days . . . in punitive segregation." *Id.* ¶¶ 58–59.   Plaintiff was also placed on "Red ID status." *Id.* ¶ 83.

On April 29, 2015, Plaintiff deliberately swallowed a razor. *Id.* ¶¶ 64–68.  Doctors at Bellevue Hospital advised him that he needed an immediate surgery, but Plaintiff refused. *Id.* ¶ 70.  A psychiatrist then evaluated Whittington, determined he was incapable of making this medical decision, and contacted his sister, who agreed to procedure. *Id.* ¶¶ 71–72.  After the procedure, Whittington continued to receive "near-daily mental health or medical treatment." *Id.* ¶ 77.  He was again charged with various infractions (such as possession of a contraband weapon) and was sentenced to 30 days of punitive segregation. *Id.* ¶ 80.

From July to November 2015, Plaintiff was placed in the Albany County Correctional Facility, which is under the jurisdiction of Albany County. *Id.* ¶ 93.  After his return to City custody, he complained that he had not been receiving various medications. *Id.* ¶ 96.  And on December 31, 2015, Plaintiff claims he was denied visitation rights. *Id.* ¶ 106.

On January 7, 2016, Plaintiff set fire to part of his cell. *Id.* ¶ 110.  He later described this as a suicide attempt.  Whittington Dep. 249:15-23.  After Correctional Officers extinguished the

fire, Plaintiff was restrained in a medical chair for further treatment.  He broke out of the chair, punched one Correctional Officer, and pushed another to the floor.  Def. 56.1 ¶ 115.  A corrections officer used a chemical agent, but Plaintiff threw various objects at Officers.  *Id.* ¶¶ 116–120.  After being restrained, Whittington was examined and transported to Bellevue Hospital, but refused treatment.  *Id.* ¶¶ 121–125.  He was charged with various infractions (such as possessing a contraband lighter), found guilty, and sentenced to 60 days in punitive segregation.  *Id.* ¶¶ 131–135.

On February 18, 2016, the City limited Whittington's right to receive visitors.  On March 17, 2016, Plaintiff used force against several Officers and had to be restrained, but was not charged with an infraction.  *Id.* ¶¶ 148–163.  On March 25, 2016, Plaintiff again used force on various Officers and had to be restrained.  *Id.* ¶¶ 164–173.  He was served with an infraction and sentenced to 30-days in punitive segregation.  *Id.* ¶¶ 174–183.  On March 29, 2016, Plaintiff "positioned a 'curtain' to effectively block officers' ability to see into plaintiff's cell," refused to remove the curtain, and used force against several officers who entered his cell.  *Id.* ¶¶ 184–190.  He received medical care, was served with an infraction, and sentenced to 10-days in punitive segregation.  *Id.* ¶¶ 191–204.  On June 5, 2016, Plaintiff used force against various officers, was restrained, received medical treatment, and charged with an infraction, but no penalty was imposed.  *Id.* ¶¶ 205–219.

On August 7, 2016, Whittington used force against several officers, causing them severe injury.  *Id.* ¶¶ 220–223.  He received medical treatment and sentenced to 120 days of punitive segregation.  *Id.* ¶¶ 224–240.  As a result of this incident, Whittington was criminally charged in state court, but the charges were ultimately dismissed.  *Id.* ¶¶ 243–244.

On September 2, 2016, Plaintiff was transferred into the custody of New York State.  He remains incarcerated in the State's custody, and is currently housed at the Attica Correctional Facility.  Dkt. No. 160, Ex. AA, at DEFS_06760.  In total, Whittington received 85 infractions during the relevant period, and was found guilty on 82 of 85.  *Id.*

### D.  Procedural History

Plaintiff filed this lawsuit on February 11, 2016.  *See* Dkt. No. 2.  He subsequently amended his Complaint multiple times.  See Dkt. No. 44 at 1–4 (recounting this procedural history).  Portions of these complaints were often illegible or otherwise incomprehensible.  *Id.* At the Court's direction, Plaintiff eventually submitted a "Legible Version" of his Complaint. *See* Dkt. No. 41 (LV Compl.).  Defendants then moved under Federal Rule of Civil Procedure Rule 12(e) for a more definite statement of this Complaint.  The Court denied this request, noting that the "three opportunities [Plaintiff] has been given thus far to amend or resubmit his complaint have not resulted in material improvements to the clarity of his allegations.  There is little reason to believe that a fourth opportunity . . . would produce a different outcome."  Dkt. No. 44 at 4–5.

Instead of ordering Plaintiff to provide a more definite statement, the Court restated Plaintiff's pleading "so as to do justice."  Fed. R. Civ. P. 8(e).  The Court liberally construed his allegations into seventeen numbered paragraphs.  Dkt. No. 44 at 5–11.  And it construed his filing to allege claims for "(a) excessive force in violation of the Fourth and Fourteenth Amendments to the United States Constitution; (b) unreasonable searches in violation of the Fourth and Fourteenth Amendments; ( c) withholding medical care in deliberate indifference to plaintiffs health in violation of the Fourteenth Amendment; (d) using false reports of infractions to initiate prison disciplinary proceedings and subject plaintiff to punitive segregation in violation of the Fourteenth Amendment; and (e) retaliation for plaintiffs exercise of his right to

7

petition for redress of his grievances in violation of the First and Fourteenth Amendments." *Id.*
10–11. Plaintiff seeks damages with respect to several officers under 42 U.S.C. § 1983 and with
respect to the City under *Monell v. Dep't of Soc. Servs. of City of N.Y.*, 436 U.S. 658 (1978). *Id.*
However, the Court took no position on whether Plaintiff had actually stated any claim for relief.
*Id.*

The Defendants in this matter are the City of New York, Commissioner Joseph Ponte,
Hazel Jennings, Captain Bradford, Correction Officer Lanham, Correction Officer Shinaul,
Assistant Deputy Warden Brown, Captain Brown, Shield No. 821, Correction Officer
Dalrymple, Correction Officer Jones, Correction Officer Harris, Correction Officer Pagan,
Retired Captain Collens, Retired Captain Collazzo, Correction Officer Dill, Correction Officer
Lamar, and Captain Brown, Shield No. 491. Plaintiff voluntarily dismissed his claims against
two others, Officers Hughes and Medina, and they are no longer parties to this action. *See* Dkt.
No. 88.

After lengthy discovery, ably overseen by Magistrate Judge Moses, Defendants moved
for summary judgment as to all claims. Dkt. No. 158. This motion is now before the Court.

## II.   LEGAL STANDARD

Under Federal Rule of Civil Procedure 56(a), summary judgment may be granted only if
all the submissions taken together "show that there is no genuine issue as to any material fact and
that the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477
U.S. 317, 322 (1986) (internal citation and quotation marks omitted); *see also Anderson v.
Liberty Lobby, Inc*., 477 U.S. 242, 247-48 (1986). A fact is "material" if it "might affect the
outcome of the suit under the governing law," and is genuinely in dispute "if the evidence is such
that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at
248; *see also Jeffreys v. City of New York*, 426 F.3d 549, 553 (2d Cir. 2005). The nonmoving

party "must do more than simply show that there is some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp*., 475 U.S. 574, 586 (1986), and cannot rely on "mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment," *Knight v. U.S. Fire Ins. Co*., 804 F.2d 9, 12 (2d Cir. 1986). "When ruling on a summary judgment motion, the district court must construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant." *Dallas Aerospace, Inc. v. CIS Air Corp*., 352 F.3d 775, 780 (2d Cir. 2003). However, "[m]ere conclusory allegations or denials cannot by themselves create a genuine issue of material fact where none would otherwise exist." *Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir. 2010) (citation and alterations omitted).

The Second Circuit has instructed that when a court considers a motion for summary judgment, "special solicitude" should be afforded a pro se litigant. *See Graham*, 848 F.2d at 344. The Court must construe "the submissions of a pro se litigant . . . liberally" and interpret them "to raise the strongest arguments that they suggest." *Triestman v. Fed. Bureau of Prisons*, 470 F.3d 471, 474 (2d Cir. 2006) (italics and quotation marks omitted). "Nonetheless, proceeding pro se does not otherwise relieve a litigant of the usual requirements of summary judgment, and a pro se party's bald assertions unsupported by evidence . . . are insufficient to overcome a motion for summary judgment." *Houston v. Teamsters Local 210, Affiliated Health & Ins. Fund-Vacation Fringe Ben. Fund*, 27 F. Supp. 3d 346, 351 (E.D.N.Y. 2014) (alterations, italics, and quotation marks omitted); *see also Flores v. City of New York*, No. 15-CV-2903, 2017 WL 3263147, at *2 (S.D.N.Y. July 31, 2017) (same). Litigants "should be on notice from the very publication of Rule 56(e) that a party faced with a summary judgment motion may not rest upon the mere allegations or denials of the party's pleading and that if the party does not

respond properly, summary judgment, if appropriate, shall be entered against him." *Champion v. Artuz*, 76 F.3d 483, 485 (2d Cir. 1996) (internal quotation marks omitted)).  A nonmoving plaintiff "may not reply upon conclusory allegations or denials, but instead must produce evidence in admissible form, setting forth 'concrete particulars' showing that a trial is needed." *R.G. Group, Inc. v. Horn & Hardart Co*., 751 F.2d 69, 77 (2d Cir. 1984); *see also Read v. Town of Suffern Police Dep't*, 2013 WL 3193413, at *3 (S.D.N.Y. June 25, 2013) ("even where the non-movant is pro se, mere 'conclusory statements, conjecture, or speculation by the party resisting the motion will not defeat summary judgment'" (quoting *Kulak v. City of New York*, 88 F.3d 63, 71 (2d Cir. 1996))).

### III.    WHITTINGTON FAILS TO DEMONSTRATE PERSONAL INVOLVEMENT AS TO SEVERAL CLAIMS

The undisputed facts in this case entitle Defendants to judgment as a matter of law for several reasons.  The first reason is that Whittington has not adduced any evidence (or indeed, even alleged) that any of the Individual Defendants were personally involved in several of his claims.

When a § 1983 claim is brought against individual defendants, the plaintiff must allege personal involvement of each named individual.  *See Farid v. Ellen*, 593 F.3d 233, 249 (2d Cir. 2010) ("It is well settled in this Circuit that personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983.") (internal quotation marks omitted); *Woodward v. Morgenthau*, 740 F. Supp. 2d 433, 437 (S.D.N.Y. 2010) (dismissing claims where plaintiff "has not alleged any facts indicating that . . . these defendants was personally involved in the alleged violations").  Moreover, the personal involvement of a supervisor may be demonstrated by evidence that:

> (1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring.

*Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir. 1995).

Plaintiff has not alleged—and no facts in the record support—the Individual Defendants' personal involvement in several of Plaintiffs' claims: (1) deliberate indifference, arising in October 2014 (Compl. ¶ 2); (2) unconstitutional conditions of confinement, arising in November 2014 (*Id.* ¶ 5); (3) deliberate indifference, arising in November 2014 (*Id.* ¶ 5); (4) unreasonable search, arising in late 2014 (*Id.* ¶¶ 6, 11) (5) deliberate indifference, arising in April 2015 (*Id.* ¶ 8); (6) deliberate indifference, arising in late 2015 (*Id.* ¶ 10); (7) unreasonable search, arising in March 2015 (*Id.* ¶ 14); (8) deliberate indifference, arising in March 2015 (*Id.* ¶ 14); (9) unreasonable search, arising around March 2016 (*Id.* ¶¶ 14, 17) (10) deliberate indifference, arising in August 2016 (*Id.* ¶ 17); (11) unconstitutional conditions of confinement, arising in August 2016 (*Id.*). Whittington has not identified any of the Defendants here as playing a part in these alleged constitutional violations. Nor has he adduced facts showing that any of the supervisor Defendants can be held liable for his claims. For his deliberate-indifference claims, for example, he does not name as Defendants any of the medical professionals who administered his treatment. *Cf. Woods v. Goord*, No. 97 CIV. 5143 (RWS), 1998 WL 740782, at *1 (S.D.N.Y. Oct. 23, 1998) (naming as defendants multiple doctors, a nurse, and a medical administrator).

In his Opposition, Plaintiff states "Plaintiff did in many grievances explain the role of the Defendants but at the time of each incident the Plaintiff know all the names of those involved until the Plaintiff perfected his claim."  Pl. Br. at 1–2.  He also argues that "[f]ailure to state each individuals role in the incident does not Constitute a dismissal and this Court retains Jurisdiction."  *Id.*  However, as discussed below, Plaintiff did not file contemporaneous grievances as to many of these claims.  Moreover, even his self-styled "grievance" documents (that Plaintiff never submitted to the City) do not identify Individual Defendants.  On summary judgment, even a non-moving party has a duty to identify the specific actors who harmed him. To be sure, Whittington is correct that this defect does not defeat jurisdiction.  However, Whittington's failure to allege or prove personal involvement is reason enough for the Court to grant Defendants summary judgment as to these claims.

## IV.   WHITTINGTON HAS FAILED TO EXHAUST MOST OF HIS CLAIMS

The Court also grants Defendants summary judgment because it is undisputed that Plaintiff has failed to administratively exhaust most of his claims, and he has not, as a matter of law, justified that failure.

### A.  The Exhaustion Standard

Under the Prison Litigation Reform Act, "[n]o action shall be brought with respect to prison conditions under . . . Federal law[] by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted."  42 U.S.C. § 1997e(a).  This "language is 'mandatory': An inmate 'shall' bring 'no action' (or said more conversationally, may not bring any action) absent exhaustion of available administrative remedies."  *Ross v. Blake*, 136 S. Ct. 1850, 1856 (2016) (quoting *Woodford v. Ngo*, 548 U.S. 81, 85 (2006)).  The exhaustion requirement "applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive

force or some other wrong." *Porter v. Nussle*, 534 U.S. 516, 532 (2002). Accordingly, "[c]omplete exhaustion of . . . administrative remedies through the highest level for each claim is required." *Veloz v. New York*, 339 F.Supp.2d 505, 514 (S.D.N.Y. 2004), *aff'd*, 178 F. App'x 39 (2d Cir. 2004); *see also Porter*, 534 U.S. at 524 ("All 'available' remedies must now be exhausted; those remedies need not meet federal standards, nor must they be 'plain, speedy, and effective.'"). In addition, the exhaustion must be "proper," meaning that it must "compl[y] with an agency's deadlines and other critical procedural rules because no adjudicative system can function effectively without imposing some orderly structure on the course of its proceedings." *Woodford*, 548 U.S. at 90–91 (2006) (internal citation and quotation omitted). An inmate's claim is properly dismissed with prejudice when "administrative remedies have become unavailable after the prisoner had ample opportunity to use them and no special circumstances justified failure to exhaust." *Berry v. Kerik*, 366 F.3d 85, 88 (2d Cir. 2004). The exhaustion requirement applies even when a plaintiff seeks relief not available in prison administrative proceedings, such as monetary damages. *See Booth v. Churner*, 532 U.S. 731, 740–41 (2001).

###    B.  New York's Inmate Grievance Program

The New York Department of Corrections "has an established administrative grievance process — the Inmate Grievance and Request Program ('IGRP')." *Galberth v. Washington*, No. 14-cv-691 (KPF), 2017 WL 3278921, at *4 (S.D.N.Y. July 31, 2017), *aff'd*, 743 F. App'x 479 (2d Cir. 2018); *Mateo v. Bristow*, No. 12-cv-5052 (GWG), 2014 WL 4631569, at *11 (S.D.N.Y. Sept. 17, 2014), *report and recommendation adopted*, No. 12-CV-5052 (RJS), 2015 WL 925933 (S.D.N.Y. Mar. 4, 2015) (noting that "In New York, formal exhaustion for state prisoners generally requires complying with the three-step grievance and appeal procedure outlined in the Inmate Grievance Program."). A prisoner who wishes to file a grievance must file a form with IGRP staff within ten business days of the condition giving rise to the grievance. *Garvin v.*

*Rivera*, No. 13-cv-7054, 2015 WL 876464, at *3 (S.D.N.Y. Feb. 28, 2015) (citing DOC
Directive 3376 §§ II.F, IV.B.1).  An "informal resolution" must be provided to the inmate by
IGRP staff within five business days of receiving the form.  *Id.* (citing DOC Directive 3376
§ II.F).  "If the inmate does not accept the resolution that the IGRP staff proposes, the inmate
shall indicate on the IGRP Disposition Form, within five business days from notification of the
proposed resolution, that the inmate does not accept the resolution and requests a formal
hearing." *Feelings v. Stukes*, 15-cv-1889 (JPO), at *4-5 (S.D.N.Y. Aug. 21, 2017) (quoting DOC
Directive 3376 § IV(G)(5)(b)).  "Subsequent appeals may be taken to the Central Office Review
Committee ('CORC'), whose opinion constitutes the DOC's final decision on an inmate's
grievance or request."  *Id.* (citing DOC Directive § IV(J)); *see also Hemphill*, 380 F.3d at 682
(summarizing these steps).  Courts "have repeatedly . . . taken judicial notice of this grievance
process," and the Court does so here.  *Feliciano v. Anderson*, No. 15-cv-4106 (LTS), 2017 WL
1189747, at *8 n.15 (S.D.N.Y. Mar. 30, 2017).

Generally, "[a] prisoner has not exhausted his administrative remedies until he goes
through all three levels of the grievance procedure." *Hairston v. LaMarche*, 2006 WL 2309592,
at *7 (S.D.N.Y. Aug. 10, 2006) (citing cases); *accord Skates v. Vanbockstaele*, 2013 WL
658253, at *3 (S.D.N.Y. Feb. 25, 2013) ("[C]ourts have interpreted [42 U.S.C. § 1997e(a) ] as
requiring the complete exhaustion of institutional administrative remedies prior to commencing a
federal suit.").

### C.  Plaintiff's Self-Styled Grievances Are Insufficient to Exhaust His Claims

To start, Whittington attempts to satisfy the exhaustion requirement by providing thirteen
hand-written documents titled "Grievances."  These include: (1) a grievance dated December 1,
2015, pertaining to a claim of deliberate indifference to medical needs (see LV ¶ 10); (2) a
grievance dated December 28, 2015, alleging unreasonable searches (see LV ¶ 11); and (3) a

grievance dated December 31, 2015, alleging denial of a contact visit (see LV ¶ 11).
Whittington argues that these documents are sufficient to satisfy the PLRA's exhaustion
requirement.

The Court rejects this argument, as a matter of law, for three reasons.  First, unlike the
various proper grievances submitted by Whittington, these grievances are not in the form
required by the IRGP.  Indeed, comparing the former to the latter makes clear that his self-styled
grievances omit a host of required information and deviate from the Department of Corrections'
template for grievances.  *Compare* Dkt. No. 2. at 16 (self-styled grievance) *with* Dkt. No. 155,
Ex. SS (numerous examples of actual grievances filed with the City).  As noted, to satisfy the
exhaustion requirement, prisoners must generally satisfy a prison's internal requirements.  *See*
*generally Woodford*, 548 U.S. at 93 ("[W]e are persuaded that the PLRA exhaustion requirement
requires proper exhaustion," which requires a plaintiff "comply with the system's critical
procedural rules."); *accord Macias v. Zenk*, 495 F.3d 37, 43 (2d Cir. 2007) (noting that it is
insufficient for a prisoner merely to give notice to prison officials about her complaint).  This
includes, for example, compliance with an agency's deadlines.  *Woodford*, 548 U.S. at 90
("Proper exhaustion demands compliance with an agency's deadlines and other critical
procedural rules because no adjudicative system can function effectively without imposing some
orderly structure on the course of its proceedings.").

Second, the City states that after conducting a diligent search, it has no record of having
received any of Whittington's self-styled grievances.  *See* Dkt. No. 155, Ex. SS, Declarations of
Grievance Supervisors; Def. 56.1 ¶¶ 99, 108.  Plaintiff does not challenge the diligence of the
City's search or the multiple, sworn statements from City employees stating that these grievances
could not be located in its databases.  *Id.*  Given these undisputed facts, it is well-established that

a plaintiff's self-styled grievances are insufficient to satisfy to exhaustion requirement—or even to raise a genuine issue as to exhaustion. "Where a plaintiff provides no evidence that a grievance was actually filed, while defendant supplies evidence of searches of files and databases that failed to turn up that grievance, plaintiff's allegations are insufficient to satisfy the exhaustion requirement." *Anderson v. Spizziota*, No. 11-cv-5663 (SJF), 2016 WL 11480707, at *17 (E.D.N.Y. Feb. 12, 2016), *report and recommendation adopted sub nom. Anderson v. Sposato*, No. 11-cv-5663, 2016 WL 1275044 (E.D.N.Y. Mar. 31, 2016) (plaintiff failed to exhaust administrative remedies where plaintiff produced copies of purported grievances which contained no indicia of filing, while defendant produced evidence that these grievances could not be located in its records); *Curry v. Mazzuca*, No. 05-cv-1542, 2006 WL 250487, at *7 (S.D.N.Y. Feb. 2, 2006) (finding no evidence that a grievance was actually filed where plaintiff "has not produced a copy of this grievance, nor alleged anything specific about its content" and defendants submitted evidence of file and database searches that "failed to turn up any record" of the grievance).

Third, even if these self-styled grievances were properly submitted to the City, Whittington puts forward no evidence showing that the City ruled upon them, let alone that he followed the internal appeal process. Yet those are both prerequisites to proper exhaustion. Indeed, there is no record that the Department of Corrections even received these documents, or that it ruled upon them and completed its internal appeals process. In sum, there is no genuine dispute that the hand-written documents titled "Grievances" submitted by Whittington for purposes of this motion are insufficient to satisfy the PLRA's exhaustion requirement.

### D.  There Are No Facts in the Record Excusing Whittington's Failure to Exhaust

It is undisputed, therefore, that Whittington did not file grievances for a host of his claims. However, this is not the end of the inquiry—the PLRA carves out a narrow exception to

the exhaustion requirement.  A prisoner can argue that his failure to exhaust should be excused because administrative remedies were unavailable to him.  *See Williams v. Correction Officer Priatno*, 829 F.3d 118, 123 (2d Cir. 2016) (noting that the Supreme Court's decision in *Ross v. Blake*, 136 S.Ct. 1850 (2016), "largely supplants [earlier, more lenient Second Circuit law] by framing the exception [to exhaustion] entirely within context of whether administrative remedies were actually available to the aggrieved inmate.").  The Supreme Court has admonished that an inmate's failure to exhaust may only be excused when his prison's grievance mechanisms are literally or constructively "unavailable."  *Ross*, 136 S. Ct. at 1858.  In *Ross*, the Supreme Court recognized "three kinds of circumstances in which an administrative remedy, although officially on the books, is not capable of use to obtain relief."  *Id.* at 1859.  First, an administrative procedure is unavailable when "it operates as a simple dead end – with officers unable or consistently unwilling to provide any relief to aggrieved inmates."  *Id.*  If prison administrators either lack the necessary authority to provide any relief or possess authority but consistently decline to exercise it, the administrative channels are not "available" within the meaning of the PLRA.  *Id.*; *see also Booth v. Churner*, 532 U.S. 731, 738 (2001) ("[T]he modifier 'available' requires the possibility of some relief.").  Second, an administrative procedure is unavailable where it is "so opaque that it becomes, practically speaking, incapable of use."  *Ross*, 136 S. Ct. at 1859.  To meet this high bar, the administrative remedy must be "essentially unknowable."  *Id.* (internal quotation marks omitted).  Third, a grievance process is unavailable "when prison administrators thwart inmates from taking advantage of [it] through machination, misrepresentation, or intimidation."  *Id.* at 1860.

In his Opposition brief, Whittington provides two justifications for his lack of exhaustion: he says he "was not able to file appeals for his grievances because [1] he was harassed so much

that appealing the Complaint wouldn't be possible and [2] the fact that the Plaintiff was constantly being moved from Jail to Jail and housing unit to housing unit" Pl. Br. at 2-3.  The Court rejects this argument as a matter of law.  To start, Whittington does not argue that the City's grievance process was unavailable to him writ large.  Instead, he argues that the *appeals process* was unavailable to him because of harassment and being moved.  However, Whittington has not failed the PLRA's exhaustion requirement because of a failure to appeal—he has failed the requirement because, on the undisputed facts, he has not filed grievances *at all* as to most of his claims.

But assume that the Court were to liberally construe Whittington's Opposition Brief as arguing that these two reasons prevented him from filing grievances in the first place.  Once again, the Court must reject this theory.  There is no dispute that the City "provided grievance procedures that inmates . . . could utilize," *Hemphill*, 380 F.3d at 686—specifically, the three-step process outlined in 7 N.Y.C.R.R. § 701.5.  It is also undisputed that Whittington himself filed more than two dozen other grievances between October 2013 and August 2016; he and Defendants have produced them for purposes of this motion.  *See* Dkt. No. 160, Ex. II (Grievances).  The undisputed fact of Whittington's multiple grievances—filed *contemporaneously* with the challenged incidents for which he did *not* file grievances—cuts strongly against any theory of unavailability.  *See e.g.*, *Veloz v. New York*, 339 F. Supp. 2d 505, 516 (S.D.N.Y. 2004), *aff'd*, 178 F. App'x 39 (2d Cir. 2006) ("Plaintiff was most assuredly keenly aware of the grievance process, as he previously exhausted other claims to the highest level."); *Mateo*, 2014 WL 4637169, at *8 (relying on fact that Plaintiff had "a long history of filing prison grievances" to find availability); *Johnson v. Stevens*, No. 12-CV-5186 (RRM), 2014 WL

4722711, at *3 (E.D.N.Y. Sept. 22, 2014) ("But despite having filed numerous other grievances in the past, [plaintiff] simply declined to do so here.").

Moreover, because the "availability" test is an objective one, it is well-established that "[a] plaintiff's mere allegation of a generalized fear of retaliation is insufficient to excuse his failure to file a grievance concerning these matters." *Brown v. Napoli*, 687 F.Supp.2d 295, 297–98 (W.D.N.Y. 2009) (collecting cases); *accord Contino v. City of New York*, 2013 WL 4015816, at *6 (S.D.N.Y. Aug. 7, 2013) ("[Plaintiff's] conclusory assertion that he feared retaliation if he completed the grievance process is insufficient to excuse his obligation to exhaust the administrative grievance process."). Likewise, a plaintiff does not assert a "legitimate fear" of retaliation simply by pointing out that "his substantive claim is one for retaliation, and that he has been the subject of retaliation in the past." *Harrison*, 2007 WL 2789473, at *6 ("If every plaintiff bringing a retaliation claim could have the exhaustion requirement excused by alleging a fear of further retaliation, it would create a general exception to exhaustion for retaliation claims"); *see also Ortiz v.. McBride*, 380 F.3d 649, 654 (2d Cir. 2004) (finding that plaintiff's failure to file grievances was not excused where "[he] alleges only that he was threatened when he complained . . . [but] does not contend that the threats from guards prevented him from filing a grievance or otherwise rendered DOCS grievance procedures unavailable"). Whittington's conclusory claim in his Opposition that he faced harassment is not only belied by the two-dozen other grievances he filed, but also fails to create a genuine dispute for purposes of summary judgment.

Whittington also suggests that the sheer number of his complaints against Defendants excuse exhaustion. For example, he contends that "the level of harassment by prison officials rises to the level that shows that the Plaintiff made a reasonable attempt to exhaust his remedies

and should be excused from the exhaustion rule." Pl. Br. at 4. However, the Court finds no support for the idea the more claims a prisoner brings, the more willing a Court should be to excuse a failure to exhaust those many claims. Indeed, such a rule seems directly contrary to the purposes behind the PLRA. *See Woodford v. Ngo*, 548 U.S. 81, 84 (noting that the PLRA was designed to alleviate the quantity of prisoner litigation in federal courts). Moreover, the Supreme Court has repeatedly admonished that courts should carefully circumscribe exceptions to the PLRA's exhaustion requirement, and not engage in equitable balancing to determine if an exception is warranted. *See, e.g.*, *Ross*, 136 S. Ct. at 1856 (stating the PLRA forecloses judicial discretion to craft exceptions to the exhaustion requirement). This admonition precludes Whittington's theory.

The only other special circumstance Whittington points to is that he was "moved from Jail to Jail and housing unit to housing unit." Pl. Br. at 2–3. However, this argument also fails as a matter of law. The Second Circuit has held that "[t]he fact that [plaintiff] was transferred to a different facility after he filed his grievance does not affect this analysis because [plaintiff] retained the ability to appeal his grievance to the central office review committee even after he was transferred." *Richardson v. N.Y. State Dep't of Corr.*, 633 Fed. App'x 816, 818 (2d Cir. 2016) (citing *Giano v. Goord*, 250 F.3d 146, 150–51 (2d Cir. 2001)). Courts in this Circuit have likewise concluded that "an inmate's transfer to a new facility does not excuse him from pursing a grievance to a final administrative resolution." *Carini v. Austin*, No. 06-cv-5652 (NRB), 2008 WL 151555, at *4 (S.D.N.Y. Jan. 14, 2008) (noting that where a plaintiff has not shown that transfer rendered him unable to pursue administrative remedies, it does not, as a matter of law, constitute a "special circumstance" excusing a failure to exhaust); *Hemby v. Ferrari*, No. 9:14-cv-546 (BKS), 2016 WL 3166895, at *9 (N.D.N.Y. 2016) ("plaintiff's assertion that the

grievance[s] 'never followed him' when he was transferred is insufficient to create an issue of material fact.").

In short, Whittington has failed to overcome the exhaustion requirement as to multiple claims:[1] (1) deliberate indifference, arising around October 2014 (Compl. ¶ 2); (2) due process, arising around November 11, 2014 (*Id.* ¶ 3); (3) unconstitutional conditions of confinement, arising about November 16, 2014 (*Id.* ¶ 5); (4) excessive force, arising around November 2014 (*Id.* ¶ 5); (5) deliberate indifference, arising around November 2014 (*Id.* ¶ 5); (6) due process claim for movement to high-security housing, arising in late 2014 (*Id.* ¶ 6); (7) excessive cell searches in late 2014 (*Id.* ¶ 6); (8) due process, arising around April 2015 (*Id.* ¶ 9); (9) excessive force, arising around July 2015 (*Id.* ¶ 10); (10) unreasonable search, arising around November 2015 (*Id.* ¶ 11); (11) deliberate indifference, arising in late 2015 (*Id.*); (12) denial of visitation rights in late 2015 (*Id.* ¶¶ 11, 12); (13) excessive force, arising around January 2016 (*Id.* ¶ 11); (14) excessive force, arising out of multiple incidents in March 2016 (*Id.* ¶ 16); (15) due process, arising around March 2016 (*Id.* ¶ 13); (16) retaliation, arising around March 2016 (*Id.* ¶ 14); (17) unreasonable search, arising around March 2016 (*Id.* 15); (18) due process, arising around March 2016 (*Id.* ¶ 13); (19) excessive force, arising out of multiple incidents in June and August 2016 (*Id.* ¶¶ 16, 17); (20) due process, arising out of multiple incidents in June and August 2016 (*Id.* ¶¶ 16, 17); (21) deliberate indifference, arising around August 2016 (*Id.* ¶ 17); (22) conditions of confinement, arising around August 2016 (*Id.* ¶ 17).  The Court thus grants Defendants summary judgment as to these claims.

---

[1] The Court also granted Defendants summary judgment as to some of these claims for a failure to demonstrate personal involvement, *supra*.  These claims likewise fail for a failure to exhaust.

V.   **THE INDIVIDUAL OFFICERS ARE ENTITLED TO JUDGMENT AS A MATTER OF LAW ON THE REMAINING CLAIMS**

As to the remaining excessive force and due process claims, the Court concludes that the Individual Defendants are entitled to judgment as a matter of law.  The Court reviews these claims in turn.

A.   **Plaintiff's Excessive-Force Claim**

Whittington raises an excessive-force claim arising from an incident on January 16, 2015. Compl. ¶ 7.  Because Plaintiff was a pretrial detainee at the time of the alleged incident, the Fourteenth Amendment's Due Process Clause governs his excessive-force claim.  *See United States v. Walsh*, 194 F.3d 37, 47 (2d Cir. 1999) ("While the Eighth Amendment's protection does not apply until after conviction and sentence, the right of pretrial detainees to be free from excessive force amounting to punishment is protected by the Due Process Clause of the Fourteenth Amendment.") (internal quotation marks and citations omitted).  To succeed on such a claim, a pretrial detainee like Whittington "must show only that the force purposely or knowingly used against him was objectively unreasonable."  *Kingsley v. Hendrickson*, 135 S.Ct. 2466, 2473 (2015); *accord County of Sacramento v. Lewis*, 523 U.S. 833, 849 (1998) ("liability for negligently inflicted harm is categorically beneath the threshold of constitutional due process.").  Excessive-force claims brought by pretrial detainees no longer contain a subjective prong.  *Kingsley*, 135 S.Ct at 2473.

To be unreasonable, the conduct at issue must be "sufficiently serious . . . to reach constitutional dimensions."  *Romano v. Howarth*, 998 F.2d 101, 105 (2d Cir. 1993) (internal quotation marks omitted).  The Court must judge the conduct "from the perspective and with the knowledge of the defendant officer[s]," *Kingsley*, 135 S. Ct. at 2474, and evaluate it "in light of contemporary standards of decency," *Wright v. Goord*, 554 F.3d 255, 268 (2d Cir. 2009)

(internal quotation marks omitted).  In making this evaluation, the Court may consider, among other factors, "the relationship between the need for the use of force and the amount of force used; the extent of the plaintiff's injury; any effort made by the officer to temper or to limit the amount of force; the severity of the security problem at issue; the threat reasonably perceived by the officer; and whether the plaintiff was actively resisting."  *Kingsley*, 135 S. Ct. at 2473 (citing *Graham v. Connor*, 490 U.S. 386, 396 (1989)); *see also Musaid v. Manka*, No. 13-cv-7880 (PKC), 2016 WL 540806, at *4 (S.D.N.Y. Feb. 9, 2016).  "[O]bjective reasonableness turns on the 'facts and circumstances of each particular case.'"  *Kingsley*, 135 S. Ct. at 2473 (quoting *Graham*, 490 U.S. at 396).  The Court must also account for the "'legitimate interests that stem from [the government's] need to manage the facility in which the individual is detained,' appropriately deferring to 'policies and practices that in th[e] judgment' of jail officials 'are needed to preserve internal order and discipline and to maintain institutional security.' "  *Id.* (quoting *Wolfish*, 441 U.S. at 540).  Accordingly, "[w]hether the force used in connection with the arrest is reasonable depends on a careful weighing of the totality of the circumstances in each particular case, including whether the suspect poses a threat, resists, or attempts to evade arrest, and the severity of the crime at issue."  *Felmine v. City of New York*, No. 09 Civ. 3768, 2011 WL 4543268, at *18 (E.D.N.Y. Sept. 29, 2011).

As noted, Plaintiff's only remaining excessive-force claim arises out of an incident that occurred on January 16, 2015.  On that day, City officials were searching Whittington in the North Infirmary Center.  Def. 56.1 ¶ 43.[2]  Despite being directly ordered to do so, Whittington

---

[2] In its factual recitation, the City relies on video surveillance of this incident. See Def. 56.1 ¶ 44.  The City has provided that video to the Court. See Dkt. No. 160, Exhibit HH.  The City also provides video surveillance for claims that the Court has dismissed on other grounds.  *See, e.g.*. Dkt. No. 160, Exhibit J.  In his Opposition brief, however, Plaintiff states that "[t]he video and audio evidence in this case cannot be viewed by the Plaintiff because they are all in the Form of DVD's and the Department of Corrections will not provide the means for the Plaintiff to view them.  Any references to the video and audio made by the Defendants . . . put the Plaintiff in a position whereas he cannot use that same evidence to support a legal standing on his claims."  Pl. Br. at 1–2.

refused to remove his belt and jewelry.  *Id.*  It is undisputed that Whittington then placed the

chain that he was wearing around his neck into his mouth.  *Id.* ¶ 44; Whittington Dep. 82:5-7

(agreeing that he "put the chain in [his] mouth when the officer asked [him] to hand over the

chain.").  He then "threw his belt on the floor at non-party C.O. Wisch's feet."  Def. 56.1 ¶ 45.

"When C.O. Wisch attempted to pick up the belt, plaintiff attempted to strike the officer."  *Id.*

And as "the officers attempted to gain plaintiff's compliance, Captain Collazzo utilized a one (1)

second burst of chemical agent."  *Id.* 46.  Because the chemical agent "did not have the desired

effect because plaintiff continued to struggle with officers," the same Defendant used another

"one (1) second burst of chemical agent."  *Id.* ¶ 47.  Whittington "continued to physically resist

before he was ultimately restrained."  *Id.*  After the incident concluded, "plaintiff was brought to

the main intake decontamination area and was decontaminated with cool water."  *Id.* ¶ 48.  He

was also "brought to the urgicare center and examined by [a] physician's assistant," and

"Plaintiff's skin was rinsed and lotion was applied."  *Id.* ¶ 50.

Even reading his Opposition liberally, Whittington does not challenge this factual

recitation.  Instead, he argues that "in January of 2015 the Plaintiff was maliciously sprayed with

chemical agents . . . and the Plaintiff was denied medical treatment for hours by the Defendants."

Pl Br. at 3.  As to the excessive-force claim, therefore, Whittington challenges the use of the

chemical agent as excessive.  However, "[t]he use of pepper spray is not an actionable

constitutional violation where there is no lasting injury, and where the subject was not

cooperating with law enforcement."  *Walton v. Lee*, No. 15 CIV. 3080 (PGG), 2019 WL

1437912, at *6 (S.D.N.Y. Mar. 29, 2019); *accord Williams v. City of New York*, No. 05 Civ.

---

To begin, the Court notes that Whittington did not raise this objection during discovery.  However, given
the special solicitude afforded to pro se litigants, the Court does not rely on any of the video evidence in this case in
reaching its decision.  The Court relies instead on the Defendants' textual description of the January 15, 2015
incident.

10230, 2007 WL 2214390, at *12 (S.D.N.Y. July 26, 2007) (use of mace was "not actionable" as excessive force where the arrestee "suffered only the expected side effects: temporary discomfort and disorientation").  In *Walton*, for example, the court concluded that "to the extent that Plaintiff's excessive force claim is premised on Defendants' use of pepper spray, Defendants are entitled to summary judgment."  *Walton*, 2019 WL 1437912, at *6.

The same is true here.  Whittington's contemporaneous medical report indicates that he received medical treatment on January 16, 2015.  The file from that day states that Whittington reported "exposure to chemical agent" and "hav[ing] swallow[ed] some pills in an [attempt] to hide it from DOC."  Dkt. No. 160, Ex. F. at DEFS 3450.  In his Complaint and Opposition, Whittington does not mention the swallowed pills.  The medical provider reported that Whittington was "well-hydrated, well-nourished, well-groomed, well-appearing" and experiencing "no acute distress."  *Id.*  As for treatment, the provider reported starting Whittington on "Albuterol Sulfate Nubulization solution" and conducted "copious skin rinsing with water" and "[applied] [lotion] to skin."  *Id.* at DEFS 3451.  The provider also noted that "[patient] refused [activated charcoal] and threw it on my face."  Id.  Whittington presents no facts, and does not even argue, that this report is inaccurate in any way.  His short-lasting injuries arising from this incident, therefore, are the natural consequence of the use of pepper spray.  Because there is not even an allegation of "lasting injury," *Walton*, 2019 WL 1437912, at *6, Whittington's excessive-force claim fails as a matter of law.

Moreover, given the undisputed fact that Whittington refused to comply with the officers' orders and physically resisted, no reasonable juror could find that the limited force used was "sufficiently serious . . . to reach constitutional dimensions."  *Romano*, 998 F.2d at 105.  This is especially so given that the Court must evaluate the use of force "from the perspective and with

the knowledge of the defendant officer[s]." *Kingsley*, 135 S. Ct. at 2474.  At this point of his incarceration, it is undisputed that prison officials documented and were aware of numerous use-of-force incidents involving Whittington.  In light of the Supreme Court's admonition that that courts must account for the "'legitimate interests that stem from [the government's] need to manage the facility in which the individual is detained," *id.* (internal quotation marks omitted), the Court concludes that the challenged use of force was objectively reasonable.  In short, Defendants are entitled to summary judgment as to this claim.[3]

### B.  Plaintiff's Due-Process Claims

Plaintiff has three remaining due-process claims.  The Court concludes that Defendants are entitled to judgment as a matter of law as to all three.

### 1.  Whittington's Falsified-Report Claim

Whittington also raises a falsified-reporting claim arising out of the January 16 incident. He alleges that after the incident concluded, "Captain Callazo, Officer Lowe, and an unidentified officer assaulted plaintiff and attempted to justify the assault by 'planting' an unspecified weapon."  Compl. ¶ 7.

To prevail on a due-process claim, "a plaintiff must establish (1) that he possessed a liberty interest and (2) that the defendant(s) deprived him of that interest as a result of insufficient process."  *Giano v. Selsky*, 238 F.3d 223, 225 (2d Cir. 2001).  The Second Circuit has long held, however, that a prison inmate has no constitutional right to be free from being falsely accused in a misbehavior report.  *See, e.g., Boddie v. Schnieder*, 105 F.3d 857, 862 (2d Cir. 1997).  As explained by the Court of Appeals, "[t]he prison inmate has no constitutionally guaranteed immunity from being falsely or wrongly accused of conduct which may result in the

---

[3] Because the Court concludes that Defendants are entitled to summary judgment on the excessive-force claim for this reason alone, the Court does not consider Defendants' independent argument that they are also entitled to qualified immunity.

deprivation of a protected liberty interest.  The plaintiff, as all other prison inmates, has the right

not to be deprived of a protected liberty interest without due process of law."  *Freeman v.*

*Rideout*, 808 F.2d 949, 951 (2d Cir.1986).

Here, Whittington was not deprived of any liberty interest as to this claim.  It is

undisputed that on January 16, Whittington received a Report and Notice of Infraction, charging

him with, among other things, "possession of contraband/weapon."  Def. 56.1 ¶ 53.  This

document also informed plaintiff of his right to a hearing as well as his rights at the hearing.  *Id.*

Plaintiff appeared and testified at his disciplinary hearing on January 29, 2015.  *Id.* ¶¶ 57-58.  On

January 30, 2015, Plaintiff was served with the "Hearing Report and Notice of Disciplinary

Disposition, informing him that he had been adjudicated not guilty of possession of

contraband/weapon."  *Id.* ¶¶ 59–60.  Whittington does not dispute these facts.  Because he was

not deprived of any liberty interest as a result of Defendants' alleged false reporting, Defendants

are entitled to summary judgment as to this claim.

## 2.  Whittington's Red ID Status Claim

Whittington next raises a due-process challenge to his designation as Red I.D. Status.

"Inmates who have been found to possess a weapon while in the . . . custody [of the DOC] are

assigned Red I.D. status."  *Benjamin v. Fraser*, 264 F.3d 175, 181 (2d Cir. 2001).  This status

requires the inmate to wear a red identification card, thereby subjecting him to special attention

during jail searches and strip frisks.  *Id.*  Red I.D. status also places an inmate in specialized

restraints called "security mitts" when moved anywhere outside of the facility.  *Id.*

To recap, it is undisputed that Whittington, on April 29, 2015, swallowed a razor and

subsequently refused medical treatment.  Plaintiff alleges that after this suicide attempt, he was

placed on "Red ID" status "without a real hearing."  *See* LV ¶ 8.  However, "[n]o prior hearing,

or any other process, is required before the initial placement of an inmate in enhanced restraints

pursuant to a Red I.D. status designation. . . . Rather, all that is required is that DOC provide

subsequent review of the justification for imposing the extra restraints that accompany Red ID

status." *Vega v. Duffy*, No. 14-cv-8104 (VSB), 2017 WL 4180020, at *7 (S.D.N.Y. Sept. 20,

2017) (quoting *Benjamin v. Fraser*, 264 F.3d 175, 188–90 (2d Cir. 2001)).  Here, it is undisputed

that Defendants followed this procedure.  Whittington was notified of his Red ID designation on

June 1, 2015, including notice of his right to a hearing and his rights at the hearing, but he

"refused to sign" the notice.  Def. 56.1 ¶ 82.  City records further indicate that a hearing was held

on June 2, 2015, subsequent to plaintiff's placement on Red ID status.  *Id.* ¶ 83.  These records

also indicate that plaintiff was served with a "Notice of Hearing Determination For Red ID

and/or Enhanced Restraint Status," but he refused to sign this document.  *Id.* ¶ 85.  Whittington

does not challenge any of these facts.  Because Plaintiff was afforded appropriate process in

connection with placement on Red ID status, Defendants are entitled to summary judgment as to

this claim.

### 3.  Whittington's Restrictions-on-Visitations Claim

Whittington also raises a due-process challenge to Defendants' decision in February 2016

to limit his visitation rights to "non-contact visits."  *See* LV ¶ 12.  "[F]reedom of association is

among the rights least compatible with incarceration."  *Overton v. Bazzetta*, 539 U.S. 126, 131

(2003).  As a result, limitations on visits that are reasonably related to a legitimate penological

interest do not violate a prisoner's constitutional right.  This is true for pretrial detainees as well.

*See Block v. Rutherford*, 468 U.S. 576, 585–89 (1984).  As the Supreme Court explained in

*Block*, "the Constitution does not require that detainees be allowed contact visits when

responsible, experienced administrators have determined, in their sound discretion, that such

visits will jeopardize the security of the facility."  *Id.* at 589.

On February 18, 2016, Plaintiff was served with a form entitled "Notice to Inmate/Visitor of Cancellation/Limitation/Denial of Visiting Privileges."  Def. 56.1 ¶ 143.  The form indicates that the facility's Visit Supervisor limited Whittington's visits to non-contact visits for a period of 180 days, and the limitation was approved by the office of the Deputy Warden of Programs.  *Id.* ¶ 144.  The form states that this restriction was imposed "[f]or the good order of [the] facility."  Dkt. No. 160, Ex. T, at DEFS_06568 to DEFS_06569.  Given Whittington's lengthy and undisputed record of infractions and violence directed towards prison staff while in custody, Defendants have satisfied their *de minimis* burden to show that this restriction was reasonably related to the legitimate penological interest of order and safety.  *See Block*, 468 U.S. at 589.  Defendants are therefore entitled to summary judgment on this claim.

## VI.   PLAINTIFF HAS PUT FORWARD NO FACTS SUPPORTING A *MONELL* CLAIM

Whittington has named the City of New York as a Defendant in this matter.  To state a constitutional claim for relief against the City, or any other municipal body, a plaintiff must allege that his constitutional injury occurred as a result of an "official municipal policy."  *Cash v. Cnty. of Erie*, 654 F.3d 324, 333 (2d Cir. 2011).  Because municipalities "are responsible only for their own illegal acts," they cannot be held "vicariously liable under § 1983 for their employees' actions."  *Connick v. Thompson*, 131 S.Ct. 1350, 1359 (2011) (citations omitted).  Official municipal policy "includes the decisions of a government's lawmakers, the acts of its policymaking officials, and practices so persistent and widespread as to practically have the force of law."  *Id.* (citing *Monell v. New York City Dep't of Social Servs.*, 436 U.S. 658, 691 (1978)).

To begin, Plaintiff cannot establish municipal liability in this case because he has not established a constitutional violation.  Moreover, this claim also fails because Plaintiff has failed to adduce any facts relating to, or even allege, the "existence of a municipal policy or custom,"

which is required "to show that the municipality took some action that caused his injuries beyond merely employing the misbehaving officer." *JF v. Carmel Cent. Sch. Dist.*, 168 F. Supp. 3d 609, 616 (S.D.N.Y. 2016) (internal quotation marks omitted).  It is well-established that plaintiffs cannot "predicate liability on a theory of respondeat superior, since that theory is unavailable for federal claims under Section 1983." *Rodriguez v. City of N.Y.*, 649 F. Supp. 2d 301, 306 (S.D.N.Y. 2009).  The City is therefore entitled to summary judgment as to Whittington's § 1983 claim.

**VII.   CONCLUSION**

The Court has considered the remainder of Whittington's claims and arguments and finds them to be without merit.  *See, e.g.*, LV Compl. at 1 (alleging, in a conclusory manner, "6th amendment violations" but providing no facts or legal argumentation supporting that theory).  The Court also declines to consider the claims Plaintiff raises for the first time in his Opposition Brief to Defendants' motion, given that he was provided four opportunities to amend his complaint.  *See* Pl. Br. at 2.  For the reasons stated above, therefore, Defendants' motion for summary judgment is GRANTED.  This resolves Dkt. No. 158.  The Clerk of Court is respectfully directed to close this case.

The Court certifies, pursuant to 28 U.S.C. § 1915(a)(3), that any appeal from this Order would not be taken in good faith, and in forma pauperis status is thus denied.  *See Coppedge v. United States*, 369 U.S. 438, 444-45 (1962).

The Court will mail a copy of this Opinion and Order to the pro se Plaintiff, and that mailing will be noted on the public docket.

SO ORDERED.

Dated:  May 27, 2020

New York, New York

_____
ALISON J. NATHAN
United States District Judge